NO. _____

| | | |
|---|---|---|
| **WILLIAM MICHAEL DEWITT,** | § | **THE UNITED STATES DISTRICT COURT** |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | **COURT NO. _____** |
| **CITY OF FORT WORTH, TEXAS,** | § | |
| **TARRANT COUNTY, TEXAS,** | § | **4-25CV-337-Y** |
| **FORMER DISTRICT ATTORNEY** | § | |
| **SHAREN WILSON,** | § | **NORTHERN DISTRICT OF TEXAS** |
| **and FORT WORTH POLICE OFFICER** | § | |
| **RANDY MOLINA,** | § | |
| **Defendants,** | § | |

---

## COMPLAINT AND DEMAND FOR JURY TRIAL

---

### I. INTRODUCTION

Plaintiff, William Michael DeWitt, brings this lawsuit against Defendant Officer Randy Molina, the City of Fort Worth, Tarrant County, and former District Attorney Sharen Wilson for violations of his constitutional rights, false arrest, malicious prosecution, defamation, and the destruction of his business and reputation as it relates to Case # 1476643.

### II. JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 42 U.S.C. § 1983 (civil rights violations).

Venue is proper in this Court under 28 U.S.C. § 1391(b), as the events giving rise to this complaint occurred in Fort Worth, Texas.

### III. PARTIES

1. Plaintiff, William Michael DeWitt, is an individual residing in the City of Fort Worth in Tarrant County, Texas at the time of the incident.

2. Defendant the City of Fort Worth is a municipal entity located in Tarrant County, Texas, and may be served with process through its city attorney.

3. Defendant Fort Worth Police Officer Randy Molina is an officer of the Fort Worth Police Department and may be served at his place of employment.

4.  Defendant Sharen Wilson is the former Tarrant County District Attorney and may be served at her residence or business address.

5.  Defendant Tarrant County is a governmental entity that may be served through the Tarrant County Attorney's Office.

## IV. FACTUAL BACKGROUND

1.  Plaintiff affirms that he has new information against Defendants that relates to malicious prosecution and criminal conduct by Defendants in relation to Case # 1476643 in Tarrant County courts for criminal arrest and felony charges of Cruelty to Non-livestock Animals.

2.  Plaintiff affirms Plaintiff recently spoke with City of Fort Worth City Council member Carlos Flores and explained the circumstances related to the above mentioned case and City of Fort Worth City Council member Carlos Flores confirmed that the Defendant, Randy Molina, an employee and state actor representing Defendant, the City of Fort Worth, Texas and their police department, did not follow legal protocol, proper procedures, and due process when making an arrest against Plaintiff charging Plaintiff with felony animal cruelty to a non-livestock animal.

3.  Plaintiff affirms he also recently discovered one of his accusers , Emily Mathe, made a social media post on Instagram after the date of the accusation and before the date of Plaintiff's arrest showing injuries that her pet dog, Sundae, sustained due to a dog fight and not due to Plaintiff's actions stating, "No i do not abuse my dog she got attacked by another dog and shes alright".

4.  Plaintiff affirms that he had recently started a business at the time of the incident with local business acquaintances and associates, Nelson Matzen and David Hagood, who wanted to grow David Hagood's lawn and landscape business that was operating under the business name 'Dave, the Grass Guy' at the time of the incident and prior to Plaintiff's communications with accusers, Dawn Painter and Emily Mathe.

5.  Plaintiff affirms that he had previously worked with Nelson Matzen as waiters at local restaurant, The Woodshed, in Fort Worth, Texas.

6.  Plaintiff affirms that Nelson Matzen and Plaintiff spoke about various business ideas and strategies to start, grow, operate, and scale local service businesses for local residential and commercial services including lawn and landscape services that Plaintiff and Nelson Matzen could eventually own and / or sell.

7.  Plaintiff affirms that Nelson Matzen later introduced Plaintiff to David Hagood who had a small lawn and landscape operation near Texas Christian University in Fort Worth, Texas but David Hagood was struggling to keep current business while away for studies at Texas A&M in Bryant, Texas.

8. Plaintiff affirms that he quickly gained recognition in the local neighborhoods for the quality and professionalism of his services and had gained several referrals on the social media site, Nextdoor.com.

9. Plaintiff affirms that his accuser, Dawn Painter, located Plaintiff's name and number for service on Nextdoor.com while working under the business 'Dave, The Grass Guy'.

10. Plaintiff affirms that he was contacted by homeowner / pet owner, Dawn Painter, of Fort Worth, TX prior to Plaintiff's arrest requesting services from Plaintiff to perform lawn and landscape cleanup of accuser, Dawn Painter's residence located at 4700 Trail Lake Drive, Fort Worth, Texas 76133.

11. Plaintiff affirms Dawn Painter communicated to Plaintiff that she felt pressure to hire the Plaintiff for immediate service due to the pressure of Defendant, the City of Fort Worth, threatening to ticket and fine the homeowner, Dawn Painter, for not properly maintaining her lawn according to city code.

12. Plaintiff affirms that Plaintiff met with his accuser, Dawn Painter, for the first and only time at the accuser's home located at 4700 Trail Lake Drive, Fort Worth, Texas 76133 shortly after communications on Nextdoor.com and over the phone.

13. Plaintiff affirms that he was driving a 2015 dark green Nissan Versa at the time of his meeting with accuser, Dawn Painter.

14. Plaintiff affirms Dawn Painter communicated to Plaintiff in person that her current lawn services were supposed to be performed by a local "kid" according to Painter's words that went by the name of "John Gabriel" or "John Peter" or "John Mark" or a name of that sort.

15. Plaintiff affirms Dawn Painter claimed to Plaintiff this "kid" had not returned for service in several weeks and that Painter's property needed immediate attention so that Defendant, the City of Fort Worth, would not ticket or fine her for her overgrown lawn.

16. Plaintiff affirms that Dawn Painter requested regular services for maintenance after the initial lawn and landscape cleanup was performed.

17. Plaintiff affirms that he communicated to Dawn Painter that he could not perform services immediately on the day of their initial meeting due to having a full schedule on the date of Plaintiff's initial meeting with Dawn Painter.

18. Plaintiff affirms that he proceeded to walk the property with the homeowner and dog owner, Dawn Painter, and met the homeowner / dog owner's pet dogs from opposite sides of the homeowner's fence with the homeowner, Dawn Painter, prior to the day of service.

19. Plaintiff affirms that he was told by the homeowner and dog owner, Dawn Painter, that her pets / dogs would be inside Painter's home upon his arrival to perform the agreed upon work.

20. Plaintiff affirms his accuser, Dawn Painter, told Plaintiff to refer to her as "Paint" stating, "That's what people call me. They call me Paint".

21. Plaintiff affirms he requested from Dawn Painter to park his vehicle upon arrival for service because Dawn Painter's residence is located on a busy road, Trail Lake Drive.

22. Plaintiff affirms Dawn Painter gave Plaintiff permission to park in the driveway upon arrival for service.

23. Upon arrival for service, Plaintiff affirms he parked his Nissan Versa into Dawn Painter's driveway backwards and began working on the cleanup of Dawn Painter's lawn.

24. Plaintiff affirms Dawn Painter's vehicle was not at the residence and no other vehicle was at the residence either.

25. Plaintiff affirms the first tool he began working with was his grass trimmer.

26. Plaintiff affirms he was working along the south end of Dawn Painter's brick home trimming the tall grass away from the side of the residence and witnessed the homeowner's dogs outside the home in the backyard and not inside the home as communicated to Plaintiff by his accuser, Dawn Painter.

27. Plaintiff affirms that Plaintiff was initially approached by homeowner's smaller dog, Moxie, who seemed to be friendly and excited to see Plaintiff, and Moxie was on the backyard side of Dawn Painter's chain link fence and Plaintiff was on the front yard side of the chain link fence.

28. Plaintiff affirms the homeowner's larger dog, Sundae, then approaches homeowner's smaller dog, Moxie, to initiate a vicious attack on the smaller dog, Moxie, by biting and latching onto the left side of Moxie's neck and throat and eventually onto Moxie's chest and abdomen.

29. Plaintiff affirms that the dog fight began in front of him on the backyard side of the residence's chain link fence while Plaintiff was standing on the front yard side of the chain link fence.

30. Plaintiff affirms Sundae was using her teeth and grip on Moxie to viciously and violently drag Moxie across homeowner's back lawn and to overpower and pin Moxie to the ground with a strong bite and grip with Sundae's teeth.

31. Plaintiff affirms Sundae showed no sign of letting go of Moxie.

32. Plaintiff affirms he believed Sundae's intentions were to kill Moxie.

33. Plaintiff affirms Moxie was defenseless except for her ability to kick her legs.

34. Plaintiff affirms that the dog attack was mostly one-sided with the larger dog, Sundae, being much larger and stronger than Moxie and Moxie did not appear to be able to defend herself very well compared to Sundae.

35. Plaintiff affirms he entered the backyard with intentions to break up the attack.

36. Plaintiff affirms the dog fight proceeded across the backyard with the dog Moxie breaking free from Sundae's bite.

37. Plaintiff affirms the dog, Moxie, ran across the yard to avoid the dog, Sundae, and ran behind the homeowner's storage shed and then towards the residence concrete back patio.

38. Plaintiff affirms the dog, Sundae, met the dog, Moxie, at the back patio where the dog, Sundae, continued attacking the dog, Moxie.

39. Plaintiff affirms he believed the dog, Moxie, was going to be killed by the dog, Sundae, from Sundae's attack and unwillingness to stop biting and attacking Moxie.

40. Plaintiff affirms while the dog, Sundae, was attacking the dog, Moxie for the second time, the backdoor opened and a girl, later to be known by the name Emily Mathe, walked outside and screamed, "OH MY GOD, BABE! SUNDAE WAS JUST ATTACKING MOXIE!" while speaking on the telephone.

41. Plaintiff affirms that only once Emily Mathe screamed did the larger dog, Sundae, release its bite grip and stop attacking the smaller dog, Moxie.

42. Plaintiff affirms Sundae's face, mouth, and teeth were covered in Moxie's blood.

43. Plaintiff affirms Moxie was laying on her back on the residence's concrete backyard patio whimpering and covered in her own blood from the injuries from Sundae's teeth and scratches.

44. Plaintiff affirms the larger dog, Sundae, then ducked her head and walked inside the residence through the backdoor that Emily Mathe walked out of.

45. Plaintiff affirms he was not introduced to this girl, Emily Mathe, prior to this moment and it was not communicated to him that anyone else was at the residence owned by Dawn Painter that he was hired to service.

46. Plaintiff affirms that the girl on the phone, Emily Mathe, had pale white skin, was short in stature, overweight, and had bright red hair wearing a t-shirt and short, bright colored spandex style shorts and had lots of cellulite marks on her thighs.

47. Plaintiff affirms the girl on the phone, Emily Mathe, witnessed Sundae's attack on Moxie.

48. Plaintiff affirms Emily Mathe paused her conversation for a brief second and replied on the phone stating, "I DON'T KNOW! MOXIE MUST HAVE GOTTEN INTO HER FOOD AGAIN!".

49. Plaintiff affirms he then noticed multiple cooking sheets or baking sheets laying on the back patio with brown kibble style dog food in them and numerous flies surrounding the dog food.

50. Plaintiff affirms that he then communicated to Emily Mathe that Plaintiff was hired to clean up the lawn and that Plaintiff witnessed the large dog inside the residence, Sundae, begin to attack the small dog laying on the ground with injuries, Moxie.

51. Plaintiff affirms that Plaintiff communicated to Emily Mathe that Sundae was the dog that initiated the dog fight and the attack.

52. Plaintiff affirms that after he communicated this to Emily Mathe, and she then spotted Plaintiff holding his grass trimmer and responded to Plaintiff, "You didn't hit her [Sundae] in the belly, did you? [ … ] because she's pregnant!".

53. Plaintiff affirms that Emily Mathe then turned and walked into the residence and shut the back door behind her.

54. Plaintiff affirms that the dog that was doing the attacking, Sundae, and the unknown girl on the phone, Emily Mathe, were now both inside the residence with the door closed and the dog that sustained the injuries from Sundae's vicious bites, Moxie, was left laying outside on the backyard patio bleeding from the dog fight.

55. Plaintiff affirms he believed the dog, Moxie, that sustained the brunt of the injuries from the dog fight, was most likely dead or dying from the seriousness of the attack by Sundae.

56. Plaintiff affirms that he believed Emily Mathe was attempting to transfer the blame of the dog fight onto Plaintiff, so Plaintiff gathered his property and left the residence.

57. Plaintiff strongly affirms that the homeowner, Dawn Painter, deceived Plaintiff by never communicating to Plaintiff that Dawn Painter had a friend or roommate, Emily Mathe, at home to tend to their pets, Moxie and Sundae.

58. Plaintiff strongly affirms that the homeowner, Dawn Painter, deceived Plaintiff by telling him her dogs would be inside the residence upon Plaintiff's arrival for service.

59. Plaintiff affirms the homeowner and accuser, Dawn Painter, began calling and text messaging Plaintiff after the dog fight.

60. Plaintiff affirms that dog owners Emily Mathe and Dawn Painter had expressed an unwillingness to take accountability of their pets' actions and a strong willingness to deceive and accuse Plaintiff of the injuries and Plaintiff immediately exercised his right to remain silent.

61. Plaintiff affirms he immediately cut communication with Dawn Painter and had never spoken with Emily Mathe prior to this incident and did not know Emily Mathe ever existed prior to their short interaction.

62. Plaintiff affirms that he then spoke with his then girlfriend and now wife, Jenice Stricker-DeWitt, his brother, Steven DeWitt, and his grandfather, WC DeWitt, of the dog fight incident that occurred at Dawn Painter's residence.

63. Plaintiff affirms he believed his accusers were going to attempt to transfer the blame of the injuries onto Plaintiff.

64. A few weeks after the incident, Plaintiff affirms he was contacted by Defendant, Randy Molina, who was working as a detective and state actor with Defendant, the City of Fort Worth through their police department and requested Plaintiff to come speak with Defendant, Randy Molina, about the dog incident in person.

65. Plaintiff affirms that he initially agreed with Defendant, Randy Molina, over the phone to meet and speak with Defendant, Randy Molina, at a later date and time at Defendant, the City of Fort Worth police station.

66. Plaintiff affirms he agreed on a scheduled date and time with Defendant, Randy Molina, to meet and discuss the incident before ending the phone call.

67. Plaintiff affirms after his phone conversation with Defendant, Randy Molina, Plaintiff took to Facebook to search Dawn Painter's profile.

68. Plaintiff affirms that Plaintiff located Dawn Painter's personal Facebook page and found that Dawn Painter made a post on Facebook after Plaintiff left Dawn Painter's residence that Plaintiff had attacked her dog, Moxie, with his grass trimmer.

69. Plaintiff affirms that he then had evidence that the homeowner, Dawn Painter, and her friend, Emily Mathe, were continuing to transfer the blame of the injuries committed by the dogs, Sundae and Moxie, onto the Plaintiff.

70. Plaintiff affirms he had also recently hired a friend, Mark Sherman McCarver of Fort Worth, Texas, to assist Plaintiff with his lawn and landscaping business to help sustain the business' growth.

71. Plaintiff affirms that he had met Mark Sherman McCarver at 24 Hour Fitness in Fort Worth, Texas and began playing on a softball team with Mark Sherman McCarver in Dallas, Texas several months prior to meeting his accusers, Dawn Painter and Emily Mathe.

72. Plaintiff affirms his friend and co-worker, Mark Sherman McCarver, became aware of Plaintiff's accusers, Dawn Painter and Emily Mathe, while working together.

73. Plaintiff had conversations with Mark Sherman McCarver about the dog incident and Mark Sherman McCarver was working with Plaintiff at the time of Plaintiff's first phone conversations with Defendant, Randy Molina.

74. Plaintiff affirms that Mark Sherman McCarver had referred Plaintiff to a neighbor of Mark's, Pam Powell, for lawn and landscape maintenance services and Mark and Pam agreed to meet for a late lunch at Rio Mamba in Fort Worth, Texas on the day of Plaintiff's first phone conversation with Defendant, Randy Molina.

75. Plaintiff affirms that while having dinner with Mark Sherman McCarver and Pam Powell, Plaintiff was reading his accuser, Dawn Painter's, Facebook posts and comments associated with the dog attack incident and became visibly upset according to Mark Sherman McCarver and Pam Powell's comments.

76. Plaintiff was communicating with his then girlfriend, Jenice Stricker-DeWitt of the phone conversation with Defendant, Rany Molina, and accuser, Dawn Painter's Facebook post and comments about Plaintiff.

77. Plaintiff affirms he then contacted his uncle, Brett Qualls, a resident of Conway, Arkansas, on Plaintiff's father's side of his family.

78. Plaintiff affirms his Uncle Brett Qualls is a career defense attorney licensed in the State of Arkansas and contracted with Pulaski County in Little Rock, Arkansas.

79. Plaintiff affirms that his Uncle Brett Qualls proceeded to explain to Plaintiff how the law works and operates and that Defendant, Randy Molina, had the legal authority to lie to Plaintiff during an interrogation.

80. Plaintiff affirms his Uncle Bret Qualls proceeded to explain to Plaintiff that Defendant, Randy Molina, could say virtually anything Defendant wanted to Plaintiff in an attempt to manipulate or coerce a confession from Plaintiff.

81. Plaintiff affirms his Uncle Brett Qualls then explained to Plaintiff that anything Plaintiff says to Defendant, Randy Molina, could then be used against Plaintiff to initiate an arrest and criminal charges against Plaintiff.

82. Plaintiff affirms his Uncle Brett Qualls continued to explain to him that Defendant, Randy Molina, could sit Plaintiff in isolation in an interrogation room indefinitely and use different forms of psychological manipulation and pressure against Plaintiff until Plaintiff made a comment or confession or anything close to a confession that could be used against Plaintiff in a court of law and as probable cause for an arrest or a criminal charge.

83. Plaintiff affirms that his Uncle Brett Qualls explained to Plaintiff not to speak with Defendant, Randy Molina, or any detective or police officer about the dog fight incident without a lawyer or legal counsel present.

84. Plaintiff affirms his Uncle Brett Qualls explained to Plaintiff that his (Brett Qualls) contract with Pulaski County in the State of Arkansas prevents him (Brett Qualls) from representing Plaintiff in the State of Texas as a private attorney.

85. Plaintiff affirms that his Uncle Brett Qualls then sternly told Plaintiff, "DO NOT GO SPEAK WITH THAT DETECTIVE WITHOUT AN ATTORNEY PRESENT" and repeated that statement more than once getting more stern each time stating, "I cannot stress this enough. DO NOT GO SPEAK WITH THAT DETECTIVE WITHOUT AN ATTORNEY PRESENT!"

86. Plaintiff affirms that he listened intently and took his Uncle Brett Qualls' advice before discontinuing the call.

87. Plaintiff affirms that he then spoke with his brother, Steven DeWitt, a resident of Fort Worth, Texas at the time of the allegations, to inquire if Steven DeWitt knew of any attorneys in or near the City of Fort Worth, Texas.

88. Plaintiff affirms that his brother, Steven DeWitt, referred Plaintiff to the only attorney Steven DeWitt knew in the area, Patrick Gallagher.

89. Plaintiff affirms that he contacted the office of Patrick Gallagher where the office's receptionist communicated to Plaintiff that Patrick Gallagher was away from his office and out of town on vacation for the dates of Plaintiff's scheduled appointment with Defendant, Randy Molina.

90. Plaintiff affirms this was the only attorney that he could locate in the area that he felt he could trust to hire to represent him when speaking with Defendant, Randy Molina.

91. Plaintiff affirms that Plaintiff attempted to contact Defendant, Randy Molina, multiple times by phone between this time and before their agreed appointment to explain to Defendant, Randy Molina, that Plaintiff would not be attending or speaking with Defendant, Randy Molina, and why but Defendant, Randy Molina, did not answer Plaintiff's calls.

92. Plaintiff affirms that on the date of Plaintiff's appointment with Defendant, Randy Molina, the Defendant, Randy Molina, contacted Plaintiff by phone within five (5) minutes of Plaintiff not being onsite for their agreed upon appointment.

93. Plaintiff affirms that Plaintiff communicated to Defendant, Randy Molina, that Plaintiff had spoken with his Uncle Bret Qualls since their previous phone call and that his Uncle Bret Qualls was a licensed attorney in the State of Arkansas and that his Uncle Bret Qualls had advised Plaintiff to not speak with Defendant, Randy Molina in private without an attorney present.

94. Plaintiff affirms this was Plaintiff communicating and exercising his right to remain silent and to not self-incriminate himself to Defendant, Randy Molina.

95. Plaintiff affirms that upon communicating this to Defendant, Randy Molina, the Defendant then responded with, "Ok" in a very upset, disappointing tone.

96. Plaintiff affirms he let Defendant, Randy Molina, end the phone conversation.

97. Plaintiff affirms that several weeks went by and Plaintiff was not contacted by Defendant, Randy Molina, or his accusers again and Plaintiff had negotiated with Plaintiff's business associates, Nelson Matzen and David Hagood, to purchase all accounts associated with 'Dave, the Grass Guy' and transition to self-ownership / sole proprietor.

98. Plaintiff affirms he then changed the business name to 'DeWitt Lawn Care' and began investing hundreds of dollars in marketing and advertising for the new business name, DeWitt Lawn Care, through VistaPrint and other marketing vendors.

99. Plaintiff affirms that Plaintiff had also upgraded his work vehicle from a dark green 2015 Nissan Versa to a dark gray Ford Ranger since the time of the dog fight at Dawn Painter's residence.

100.   Plaintiff affirms that after his second conversation with Defendant, Randy Molina, Plaintiff and Mark Sherman McCarver were followed by Plaintiff's accuser, Dawn Painter, while working and driving Plaintiff's dark gray Ford Ranger on S Granbury

Road in Fort Worth, Texas while hauling brush in the Plaintiff's truck bed to be disposed of at the dump.

101. Plaintiff affirms he and Mark Sherman McCarver were driving southbound in Plaintiff's new, dark gray Ford Ranger with Plaintiff's new truck magnets from VistaPrint advertising Plaintiff's new business name, DeWitt Lawn Care, when Mark Sherman McCarver noticed that some of the brush in the truck bed appeared to have flown out of the truck bed and onto the road

102. Plaintiff affirms that Mark Sherman McCarver then advised Plaintiff to turn around to pick-up the fallen brush.

103. Plaintiff affirms Mark Sherman McCarver then described an angry woman in a car following next to Plaintiff and Mark Sherman McCarver screaming, "GO BACK AND PICK IT UP!"... "YOU BETTER GO BACK AND PICK IT UP!".

104. Plaintiff affirms that the brush fell out of the Plaintiff's truck bed just in front of the auto mechanic business located at 5933 Wedgwood Drive, Fort Worth, Texas 76133 parallel to Granbury Road.

105. Plaintiff affirms that Plaintiff was approaching the stoplight at the intersection of S Granbury Road and S Hulen Street and Plaintiff performed a U-turn headed northbound on N Granbury Road to retrieve the brush that had fallen out of Plaintiff's truck bed and that the angry woman in the car continued to follow Plaintiff and Mark Sherman McCarver.

106. Plaintiff affirms that he proceeded to pull into the parking lot of the auto mechanic business located at 5933 Wedgwood Drive, Fort Worth, Texas 76133 and park his dark gray Ford Ranger truck.

107. Plaintiff affirms that when he pulled into the parking lot, the angry woman from the car and the stoplight had followed Plaintiff and Mark Sherman McCarver to the auto mechanic parking lot and stopped her vehicle alongside Plaintiff and Mark Sherman McCarver.

108. Plaintiff affirms that he proceeded to pick up the debris from the road at Granbury Road and place it back into his truck bed.

109. Plaintiff affirms the angry woman that had followed him and Mark Sherman McCarver continued to sit in her car staring at Plaintiff with her windows up.

110. Plaintiff affirms after he loaded the brush into his truck bed he looked at the driver of the car and approached the driver's window to see why she was still following Plaintiff and Mark Sherman McCarver.

111.   Plaintiff affirms the driver then cracked her very tinted windows and communicated to the Plaintiff, "I was just making sure y'all were going to pick it up."

112.   Plaintiff affirms he then realized the driver was his accuser, Dawn Painter.

113.   Plaintiff affirms that Plaintiff had two (2) advertising magnets on his new, dark gray Ford Ranger on each side of the cab doors that Plaintiff had recently purchased from VistaPrint with Plaintiff's new business name 'DeWitt Lawn Care' written on the magnets.

114.   Plaintiff this was the first time he had advertised his business and services as DeWitt Lawn Care since his business acquisition with Nelson Matzen and David Hagood.

115.   Plaintiff affirms this new business advertisement was later communicated to Defendant, Randy Molina, by accuser, Dawn Painter, and then to the Fort Worth Star-Telegram.

116.   Plaintiff affirms that Plaintiff abruptly communicated to his friend and co-worker, Mark Sherman McCarver, that the angry lady following them was his accuser, Dawn Painter.

117.   Plaintiff affirms that he and Mark Sherman McCarver proceeded to enter his truck and drive away to dispose of the brush.

118.   Plaintiff affirms that he was arrested just a few weeks later on October 31st (Halloween) by two (2) of the Defendant, the City of Fort Worth's police officers for the charge of felony animal cruelty to a non-livestock animal under Case # 1476643.

119.   Plaintiff affirms that on October 31st he was working on his next-door neighbor's (John's) lawn located at 5601 Wedgwood Drive in Fort Worth, Texas 76133 around midday when Plaintiff spotted an unmarked, white SUV with extremely dark tinted windows parallel parked in front of Plaintiff's neighbor's home.

120.   Plaintiff affirms there was a white man in the driver's seat leaned all the way flat as if attempting to not be seen.

121.   Plaintiff affirms while he was working, he had his grass trimmer in his hands and was simultaneously gathering trash in his pockets and hands from his customer and neighbor's lawn.

122.   Plaintiff affirms that once his pockets and hands were full of trash he proceeded to lay his grass trimmer on the ground and walked across the street of Walton Drive to his home to dump the excess trash from the lawn in his personal trash bins.

123.  Plaintiff affirms that his plumber, Gilbert Lopez and co-worker, were simultaneously working on Plaintiff's plumbing inside his home.

124.  Plaintiff affirms when he returned to retrieve his grass trimmer to continue his work, a second SUV (black) swiftly pulled in behind the parallel parked, SUV (white) and the second vehicle was immediately placed in park behind the first vehicle.

125.  Plaintiff affirms two (2) men exited each vehicle's driver's side wearing sunglasses as well as camouflage and militarized police gear each individual made a swift approach and beeline at Plaintiff, one from the right side and one from the left side.

126.  Plaintiff affirms one of the two men stated, "Put down the weed eater, Michael."

127.  Plaintiff affirms he asked, "Who are you?" or "What do you want?"

128.  Plaintiff affirms one of the men stated, "We're with the Fort Worth Police Department. This about the dog incident."

129.  Plaintiff affirms Plaintiff was standing near the neighbor's curb next to Walton Avenue under a shade tree at the time of the incident.

130.  Plaintiff affirms that he was immediately distraught when he heard why he was being arrested.

131.  Plaintiff affirms that he complied with the officer's orders and requested to have his dog, Nelson, put inside his home, to have his truck locked, and to communicate with his plumber, Gilbert Lopez.

132.  Plaintiff affirms that his pet dog, Nelson, a rescued pit bull that had been abused prior to Plaintiff rescuing him, was in Plaintiff's backyard at the time of Plaintiff's arrest and was barking at the two (2) Defendant's, the City of Fort Worth's, police officers.

133.  Plaintiff affirms that Plaintiff had to speak with plumber, Gilbert Lopez and his assistant, and asked Gilbert to put his pet dog, Nelson, inside when Gilbert was complete with his work and requested Gilbert to lock Plaintiff's residence when the plumbing work was complete.

134.  Plaintiff communicated he would speak with Gilbert about payment for service when he was released from custody and requested Gilbert to reach out to Plaintiff's girlfriend and now wife, Jenice Marie-Stricker, if Gilbert needed anything.

135.  Plaintiff affirms that his dark gray Ford Ranger was parked in his driveway and had cash and other valuables as well as expensive lawn and landscape equipment inside the

cab and the bed of the truck and Defendant's officers allowed Plaintiff to lock his vehicle.

136.    Plaintiff affirms he was never read his Miranda rights.

137.    Plaintiff was then placed in the white SUV by his arresting officer and driven to Defendant, the City of Fort Worth's jail where the Plaintiff was later read his charges and placed in a holding cell.

138.    Plaintiff affirms his arresting officer had allowed Plaintiff to contact his then girlfriend and now wife, Jenice Stricker-DeWitt, by phone on his way to Defendant's, the City of Fort Worth's, jail.

139.    Plaintiff explained to Jenice Stricker-DeWitt that he had been arrested over the dog incident that he told Jenice about several weeks prior and requested Jenice to assist with his bond release.

140.    Plaintiff affirms Jenice Stricker-DeWitt was in disbelief when she heard the Plaintiff's phone conversation stating, "Seriously?".

141.    Plaintiff affirms Jenice was a full-time nanny working in Southlake, TX at the time for the Martindale family and that Jenice immediately left work to contact a bail bondsman to assist with Plaintiff's release.

142.    Plaintiff affirms that he then hung up the phone with Jenice and his arresting officer questioned him while on their way to Defendant's, the City of Fort Worth's, jail asking Plaintiff, "Why didn't you go talk to that detective?"

143.    Plaintiff affirms he communicated back to his arresting officer, "I know that you all can lie to me and try to coerce me into a confession and those dogs were in a dog fight and you all were trying to pin it on me."

144.    Plaintiff affirms his arresting officer's demeanor immediately changed and the officer's jaw dropped in disbelief from hearing Plaintiff's reasoning for not self-incriminating himself and for exercising Plaintiff's right to remain silent and the arresting officer let his foot off the gas pedal of the white SUV while driving on the freeway northbound to Defendant, the City of Fort Worth's jail.

145.    Plaintiff affirms his arresting officer then stated, "Well, you're in the system now. You're being charged with a felony."

146.    Plaintiff affirms he then questioned the arresting officer by asking, "FELONY!?".

147.    Plaintiff affirms he had never been accused of a felony or any violent crime or any serious crime prior to this incident.

148. Plaintiff affirms his arresting officer did not seem to care that the officer's colleague and Defendant, Randy Molina, had not followed protocol or due process.

149. Plaintiff affirms that he and his arresting officer then arrived at Defendant, the City of Fort Worth's jail a few moments later.

150. Plaintiff affirms he was then booked and placed in Defendant, the City of Fort Worth's jail.

151. Plaintiff affirms that he was harassed and mocked by jail officers and other state actors within Defendant's, the City of Fort Worth, jail.

152. Plaintiff affirms that he was fingerprinted and had his mugshot taken for the first time in his life while at Defendant's, the City of Fort Worth, jail.

153. Plaintiff affirms that he had never been in any major trouble in his entire life prior to this arrest.

154. Plaintiff affirms that he pleaded with jailers inside Defendant's, the City of Fort Worth, jail to let him go for the charges of felony animal cruelty because it was a huge misunderstanding and that it was a false arrest.

155. Plaintiff affirms that jailers in Defendant's, the City of Fort Worth, jail mocked Plaintiff stating, "Nope!  You're a felon.  Nope.  We don't listen to felons.".

156. Plaintiff affirms that he was incarcerated on Halloween night and his holding cell was quickly filled with others that appeared to be and accused of being under the influence.

157. Plaintiff affirms that he witnessed Defendant's, the City of Fort Worth, jail officers slam one citizen's head into the glass window of the holding cell and created a gash in the inmate's upper right forehead and blood splattered on the glass window.

158. Plaintiff affirms another citizen / inmate was brought into the holding cell unconscious or passed out and was placed by one of Defendant's, the City of Fort Worth, jailers onto the only commode in the room face down in a slouching position.

159. Plaintiff affirms this citizen / inmate eventually vomited on the floor with no medical assistance and took several hours to sober up enough to have a conversation with any other inmates in the holding cell.

160. Plaintiff affirms that he saw hard drugs with his own eyes for the first time in his life when other police officers / state actors employed by Defendant, the City of Fort Worth,

brought in other citizens for arrest and submitted their evidence and drugs to the counter at the front of Defendant's, the City of Fort Worth, jail.

161.    Plaintiff affirms that he was later transferred to the City of Mansfield jail and was told that the City of Mansfield had a contract with Defendant, the City of Fort Worth, to house some of its overflow inmates.

162.    Plaintiff affirms that he learned from his phone conversations that Jenice Stricker-DeWitt had paid his bond within a couple of hours after learning of Plaintiff's arrest, yet Defendant, the City of Fort Worth, and the City of Mansfield jailers did not process Plaintiff's paperwork for release promptly.

163.    Plaintiff affirms that he had to stay overnight at the jails and woke up the next morning at the City of Mansfield jail expecting to be released promptly due to the timeliness of the matter.

164.    Plaintiff affirms that he continued to wait for his release the morning after his arrest for at least two (2) more hours and was told by the City of Mansfield jailers that there was no progress on his bond and paperwork for release.

165.    Plaintiff affirms he continued calling Jenice Stricker-DeWitt for updates and that Jenice communicated back to Plaintiff that she was told by Plaintiff's bondsman that they could not understand what was taking so long to process the Plaintiff's paperwork and that Plaintiff's release was taking an unusually long time.

166.    Plaintiff affirms this was the first time he had ever had to deal with a bondsman and did not know what to expect.

167.    Plaintiff affirms that he began pushing the intercom buttons from within the holding cell inside the City of Mansfield jail until a female jailer finally approached the intercom and told Plaintiff to "stop pushing my buttons".

168.    Plaintiff affirms that he explained to the jailer that his bond had been paid the day before and that his girlfriend, Jenice, communicated to Plaintiff that his bondsman stated the City of Mansfield jail should have released Plaintiff by this time.

169.    Plaintiff affirms that the City of Mansfield jailer was a young, black female and began to mock and harass Plaintiff.

170.    Plaintiff asked the City of Mansfield jailer for her name and badge number.

171.    Plaintiff affirms the City of Mansfield jailer replied, "Jackson! J-4-4-2.".

172. Plaintiff affirms he asked the jailer again to verify, and the City of Mansfield jailer replied, "Jackson. J-4-4-2".

173. Plaintiff affirms he asked the City of Mansfield jailer Jackson (J442) why her uniform had a triangle symbol with the words Integrity and Respect written on it while showing no integrity or respect to Plaintiff.

174. Plaintiff affirms that the City of Mansfield jailer Jackson (J442) then responded, "It also says not to be cruel to animals".

175. Plaintiff affirms that the City of Mansfield jailer Jackson (J442)'s superior then approached the Plaintiff and jailer Jackson (J442) and asked about the commotion.

176. Plaintiff affirms he asked Jackson's supervisor if he heard Jackson's dialogue with Plaintiff in which Jackson's supervisor responded, "Yes".

177. Plaintiff affirms he then asked Jackson's supervisor, "And are you going to do anything about it?" in which Jackson's supervisor responded, "Probably not.".

178. Plaintiff affirms Jackson's supervisor then stated, "I'm the one that can help you if you need help so what do you need?"

179. Plaintiff affirms that he then responded to Jackson's supervisor, "My bond was paid yesterday, but you're probably not going to help with that." and Plaintiff walked away.

180. Plaintiff affirms that the City of Mansfield jailer Jackson (J442) then returned to Plaintiff's cell within minutes with Plaintiff's paperwork for release.

181. Plaintiff affirms that he then contacted his girlfriend, Jenice Stricker-DeWitt and his friend and co-worker, Mark Sherman McCarver.

182. Plaintiff affirms he was then picked up from Mansfield jail by his friend, Mark Sherman McCarver, and Mark's roommate, Kevin.

183. Plaintiff affirms he spoke with the City of Mansfield jail Captain Robinson about the abuse committed by Defendants, Randy Molina and the City of Fort Worth, and asked for Captain Robinson's advice on where to report Defendant, Randy Molina.

184. Plaintiff affirms his girlfriend, Jenice Stricker-DeWitt had setup a surprise birthday for Plaintiff's 31st birthday and Plaintiff was distraught and unable to enjoy his time with friends and family.

185. Plaintiff affirms that he also had been in communications with his brother, Steven DeWitt, and immediately contacted Steven to try to retrieve a phone number for Attorney Patrick Gallagher.

186. Plaintiff affirms that Plaintiff was acquainted with Patrick Gallagher's daughter, Shannon Gallagher, through his brother, Steven DeWitt, and Shannon Gallagher was also connected with Plaintiff on social media.

187. Plaintiff affirms that he sent Shannon Gallagher a message on Facebook explaining his arrest and charges and asked for her father, Patrick Gallagher's, office number and services.

188. Plaintiff affirms Shannon Gallagher was shocked to learn of Plaintiff's charges and arrest and responded to his message, "They arrested you for that?".

189. Plaintiff affirms his brother, Steven DeWitt, and Shannon Gallagher put Plaintiff in touch with Patrick Gallagher's office who then referred Plaintiff to the offices of Attorney Coby L. Wooten in Fort Worth, TX.

190. Plaintiff affirms that Plaintiff met with Attorney Coby L. Wooten a few days later to explain his side of the story and Coby Wooten agreed to defend Plaintiff for upwards of $7,000 to $8,000.

191. Plaintiff affirms that Plaintiff agreed to hire Attorney Coby Wooten for legal defense.

192. Plaintiff affirms that Plaintiff had to begin performing a weekly check-in call with his bondsman and a third-party phone call center based on a Tarrant County court order.

193. Plaintiff affirms that he was then contacted by reporter / journalist Deanna Boyd with the Fort Worth Star-Telegram only a few days after hiring Attorney Coby Wooten to represent him.

194. Plaintiff affirms he communicated to Deanna Boyd that he did not have a comment for Deanna and that she did not have Plaintiff's permission to publish his name in any story.

195. Plaintiff asked Deanna Boyd where she received Plaintiff's phone number and information about his arrest and charge and Deanna Boyd responded that she learned of Plaintiff's story, arrest, and charges related to Case # 1476643 while inquiring with Defendants, Tarrant County and former Tarrant County District Attorney Sharen Wilson, while Deanna Boyd was in the Defendant's, Sharen Wilson, office.

196. Plaintiff affirms that Deanna Boyd with the Fort Worth Star-Telegram communicated to Plaintiff that his phone number, police report, arrest, and charge related to Case # 1476643 were made public information.

197. Plaintiff affirms Deanna Boyd with the Fort Worth Star-Telegram communicated to Plaintiff that Defendant, Sharen Wilson, communicated to Deanna Boyd that Defendant, Sharen Wilson, could not stop Deanna Boyd from reporting or publishing anything related to Plaintiff's arrest or charges.

198. Plaintiff affirms that he contacted his Attorney Coby Wooten after Plaintiff's conversation with the Fort Worth Star-Telegram's reporter, Deanna Boyd.

199. Plaintiff affirms his attorney advised him to not give a comment to the Fort Worth Star-Telegram or to any reports.

200. Plaintiff affirms that Deanna Boyd and her editor at the Fort Worth Star-Telegram proceeded to write and publish a very extensive and detailed article on the front page of the Fort Worth Star-Telegram's Saturday morning edition outlining Defendant's, Randy Molina, police report written and submitted to Defendants, Tarrant County and former Tarrant County District Attorney Sharen Wilson's office.

201. Plaintiff affirms Deanna Boyd's article painted Plaintiff as a guilty culprit and documented the dog fight injuries with photo images in her article as if they were created by Plaintiff.

202. Plaintiff affirms that his mugshot was used by Deanna Boyd, her editor, and the Fort Worth Star-Telegram, as well as lies spoken and written by Plaintiff's accusers, Dawn Painter and Emily Mathe, on the events that occurred at Dawn Painter's residence between the dogs Moxie and Sundae while Plaintiff was onsite working.

203. Plaintiff affirms false and defamatory statements were also made to Deanna Boyd, her editor, and the Fort Worth Star-Telegram by Defendant, Randy Molina, who is a hired employee and state actor representing the Defendant, the City of Fort Worth.

204. Plaintiff affirms Deanna Boyd, and the Fort Worth Star-Telegram took and Defendant, Randy Molina, accusers Dawn Painter and Emily Mathe's statements that contained lies, inaccuracies, and false accusations against Plaintiff and published them alongside photos the dogs, Moxie and Sundae, sustained during their dog fight and associated them with Plaintiff's actions as if they were factually truthful.

205. Plaintiff affirms Defendant, Randy Molina, a hired employee and state actor representing the Defendant, the City of Fort Worth, took accusations from Dawn Painter and Emily Mather that were based on speculation and hearsay and recklessly slandered and defamed Plaintiff by assisting Deanna Boyd and the Fort Worth Star-Telegram to publish lies made against Plaintiff.

206. Plaintiff affirms Defendant, Randy Molina, gave a statement to Deanna Boyd of the Fort Worth Star-Telegram claiming Defendant, Randy Molina, and his team's theory was

that Plaintiff caused injuries to the dogs Moxie and Sundae after attempting to work ahead on accuser, Dawn Painter's lawn and landscape cleanup, suggesting that Plaintiff acted out of self-defense.

207. Plaintiff affirms that Defendant, Randy Molina's theory and evidence did not constitute probable cause for a charge or an arrest or for Defendant, Randy Molina, to process the charge of Cruelty to Non-Livestock Animals as a felony charge related to "torture" or "cruelty" as is constituted in the Texas Penal Code Section 42.092.

208. Plaintiff affirms Defendant Randy Molina, intentionally neglected to mention in his statements that Plaintiff consulted with a licensed attorney to not speak with Defendant, Randy Molina, and only communicated to Deanna Boyd and in his report that Plaintiff communicated to Defendant, Randy Molina, that Plaintiff was advised by a family member not to speak with Defendant, Randy Molina, about the accusations against Plaintiff.

209. Plaintiff affirms Defendants acted with negligence, malice, and extreme recklessness against Plaintiff by making this false arrest based on false accusations against Plaintiff that led to spoken and written defamatory and slanderous reports and images that circulated throughout the internet and the community.

210. Plaintiff affirms at this point Defendants, Randy Molina and Sharen Wilson along with the City of Fort Worth and Tarrant County, attempted to illegally frame Plaintiff.

211. Plaintiff affirms that his attorney, Coby Wooten, proceeded to hand Plaintiff's legal defense over to legal counsel.

212. Plaintiff affirms his attorney, Coby Wooten, based this decision on the article written in the Fort Worth Star-Telegram by Deanna Boyd with the images and statements given to the Fort Worth Star-Telegram by Defendants.

213. Plaintiff affirms that he met with his legal team at their offices and explained that Plaintiff had witnessed a dog fight at Dawn Painter's residence and that his accuser, Emily Mathe, witnessed it as well.

214. Plaintiff affirms that he communicated to his legal team that the fight must have broken out over dog food according to Dawn Painter's friend, Emily Mathe.

215. Plaintiff affirms that he communicated that he had specific exculpatory information spoken to him by Emily Mathe about the dog Sundae being pregnant and the phone conversation Emily Mathe had with a third party that would exonerate Plaintiff.

216. Plaintiff affirms that his new attorney explained to Plaintiff that the case and the system most likely do not operate the way the Plaintiff believes the system works and

operates and that none of the Plaintiff's statements or information will prove that Plaintiff was innocent and falsely accused.

217. Plaintiff affirms that his attorney explained to Plaintiff that Defendants, Randy Molina and former Tarrant County District Attorney Sharen Wilson's excuse for probable cause of Plaintiff's arrest was explained to Plaintiff's attorney and that because Plaintiff left the homeowner's residence after the dog's injuries occurred this constituted probable cause with Defendants claiming that Plaintiff "ran".

218. Plaintiff strongly affirms that he left Dawn Painter's residence after Emily Mathe attempted to transfer the blame of the dog fight onto Plaintiff and did not "run".

219. Plaintiff affirms that his legal counsel communicated to Plaintiff that Defendant, former Tarrant County District Attorney Sharen Wilson, who responded by pointing at the dogs' injuries and asking additional questions of "well, what's that?" while pointing at laceration injuries sustained from the dogs' fight.

220. Plaintiff affirms that his attorney communicated to him that Defendant, former Tarrant County District Attorney Sharen Wilson and her prosecution team stated to Plaintiff's attorney that Defendant, Sharen Wilson's office was not going to drop the charges of felony animal cruelty to a non-livestock animal with up to two (2) years sentence in state prison.

221. Plaintiff affirms that after this was communicated to him by his attorneys he went through a period of intense stress, extreme restlessness, depression, anxiety, and extreme weight loss as well as inability to focus and night terrors.

222. Plaintiff affirms that his legal proceedings took place during the Thanksgiving, Christmas, and New Year holidays and Plaintiff could not focus or enjoy his time with his friends, loved ones, and family.

223. Plaintiff affirms that the article written by Deanna Boyd in the front page of the Saturday morning addition of the Fort Worth Star-Telegram was shared across the internet and led to dozens of extremely difficult conversations with Plaintiff's existing and prospective clientele, as well as Plaintiff's friends, family members, then girlfriend and now wife, Jenice Stricker-DeWitt, brother Steven DeWitt, late grandfather WC DeWitt, late grandmother Patsa Ragsdale, mother Christine DeWitt, father Mark DeWitt, uncles Bret Qualls and Jeff McMillin, cousins Blaine Fry, Robert Fry, Jera Cobb, Blake Cobb, Dave Miller, aunts Gloria Miller, Carolyn Fry, Donna McMillin, Mary Etta Qualls, future in-laws Margaret Stricker, Roger Stricker, Kristin Stricker, Cari Stricker, Betty Dehring, Greg Dehring, Jay Dehring, former business associates Nelson Matzen and David Hagood, and other acquaintances within the neighborhood and community as well as within the local landscape industry and community.

224. Plaintiff affirms he was contacted by his attorneys approximately 6 months into the legal matter and they communicated to Plaintiff that a grand jury declined to indict Plaintiff and Plaintiff was "no-billed" by a grand jury meaning Plaintiff was not determined innocent but only that a grand jury determined there was not enough evidence presented by Defendants to move forward with his Case # 1476643.

225. Plaintiff affirms this process from arrest to being declined by a grand jury lasted approximately six (6) months.

226. Plaintiff affirms the Fort Worth Star-Telegram, and their reporter Mark David Smith and editor wrote and published a tiny retraction in their newspaper that was only a fraction of their original article and took a statement from Plaintiff's accuser, Dawn Painter, but did not contact Plaintiff for his statement and again used Plaintiff's mugshot in their publication.

227. Plaintiff affirms accuser, Dawn Painter, communicated to the Fort Worth Star-Telegram that "this is why people take matters into their own hands".

228. Plaintiff affirms that he spoke with his accuser on the phone after the grand jury declined to no-bill Plaintiff about her lies in which she declined to comment.

229. Plaintiff affirms he ran into his accuser, Dawn Painter, and the QuikTrip gas station on Granbury Road and confronted her about her lies in which she declined to comment.

230. Plaintiff affirms his accuser, Dawn Painter, had parked her vehicle outside of Plaintiff's home while he was working in his yard before Plaintiff and his wife sold his home and moved.

231. Plaintiff affirms that he later was visiting with attorney Patrick Gallagher and brother, Steven DeWitt, at Patrick Gallagher's home while Steven and Patrick were enjoying cocktails and discussions about basketball.

232. Plaintiff affirms that he then asked then attorney, now Tarrant County judge, Patrick Gallagher, if Plaintiff had standing and cause related to Case # 1476643 for Plaintiff to bring suit against Defendants and accusers, Dawn Painter and Emily Mathe, in which Patrick Gallagher responded, "yes".

233. Plaintiff affirms that attorney Patrick Gallagher would later go on to run for office for a county judge position in Tarrant County and is now a judge for Defendant, Tarrant County.

234. Plaintiff affirms he submitted evidence of criminal theft and vandalism taking place at his residence to Defendant, the City of Fort Worth's police department after this incident and Defendant's police department neglected to open a report or investigation despite Plaintiff submitting evidence to Defendant's police department.

235. Plaintiff affirms that due to the defamatory claims against him and his business, he was forced to rename his business once again and lost the recent marketing investments made into marketing and advertising for DeWitt Lawn Care.

236. Plaintiff affirms that some of Plaintiff's existing clientele opted to terminate the business relationship with Plaintiff or simply stopped communicating with Plaintiff altogether.

237. Plaintiff affirms that new, prospective customers also opted to not hire Plaintiff based on the false arrest, false charges, and false and defamatory statements made and published against Plaintiff.

238. Plaintiff affirms that Plaintiff has since been called an animal abuser on more than one occasion after the accusations and case brought against him by Defendants.

239. Plaintiff affirms that business associate, German Duran, formerly with the Texas Rangers Baseball Club and The Dallas Tigers Baseball Club, called Plaintiff an aggressive person and an animal abuser.

240. Plaintiff affirms that he later was called an animal abuser by his Uncle Brett Qualls during a debate.

241. Plaintiff affirms that his relationships with friends, family, loved ones, and business associates dramatically suffered.

242. Plaintiff affirms the Defendants did not follow legal protocol or due process throughout their investigation and prosecution.

243. Plaintiff affirms that he has since contacted the City of Fort Worth Police Department's Internal Affairs Division and Defendant, Randy Molina's colleagues have illegally protected the Defendant from being investigated, reprimanded, disciplined, terminated, arrested, or charged for his criminal abuse and corruption and other employees / state actors of Defendant, the City of Fort Worth, have acted as accomplices to Defendant's criminal corruption and criminal abuse of authority.

244. Plaintiff affirms he has since learned that Defendant Randy Molina has received a promotion within the Defendant, the City of Fort Worth's police department.

245. Plaintiff affirms he has since learned that officers within the Defendant, the City of Fort Worth's police department including Internal Affairs Division and Special Investigations Unit intentionally do not follow legal protocol and procedures as well as due process when it comes to reprimanding their officers including Defendant, Randy Molina.

246.   Plaintiff affirms he has since learned that Defendant, the City of Fort Worth, is knowingly and intentionally allowing law enforcement officers and state actors such as Defendant Randy Molina, to engage in Constitutional violations as well as violations of state and federal laws, further incriminating Defendants.

247.   Plaintiff affirms Defendant Randy Molina maliciously worked with dog owners to falsely accuse Plaintiff of injuring the dogs and initiated an unlawful arrest and unlawful detainment with no probable cause in an attempt to frame Plaintiff.

248.   Plaintiff affirms Defendant, Randy Molina intentionally did not follow legal protocol and due process, escalating a Class A misdemeanor accusation based on speculation, circumstantial evidence, and hearsay to a felony, claiming Defendant had probable cause to charge Plaintiff for torturing the dogs Moxie and Sundae, subjecting Plaintiff to up to two (2) years in state prison.

249.   Defendants communicated false information to the Fort Worth Star-Telegram and journalist Deanna Boyd, and wrongfully and illegally attempted to frame and defame Plaintiff as a violent offender.

250.   Plaintiff confirmed with Fort Worth City Council member Carlos Flores that Defendants did not follow standard procedures and legal protocols and did not follow due process.

251.   Plaintiff affirms that he communicated back to Carlos Flores that Plaintiff has significant evidence and information that law enforcement employed by Defendant, the City of Fort Worth, and Defendant, Tarrant County, are performing political favors and bribes for public officials at the local city and county levels as well as at the state and federal levels.

252.   Plaintiff affirms new evidence with his accusers and Defendants has surfaced proving that Plaintiff's accusers knew the dogs Moxie and Sundae were fighting with one another, contradicting the claims against Plaintiff.

253.   Plaintiff's mugshot and false accusations were publicly disseminated in the local news and across the internet for the world to see, severely damaging Plaintiff's reputation and business.

254.   Plaintiff suffered tremendous financial losses, lost clientele, and was forced to change his business name and eventually had to leave the industry.

255.   The false allegations caused Plaintiff to lose investment opportunities amounting to six (6) to seven (7) figures or more plus equity in the future of the business when his client and local investor, Andrew Geesbreght, committed and simultaneously decommitted to a "healthy" buyout of the Plaintiff and his business, Michael's Quality Lawn Care.

256.   The false charges and defamatory coverage by the Fort Worth Star-Telegram have continued to impact Plaintiff's professional and personal life.

257.   Plaintiff maintains that he never harmed an animal and has an established history of rescuing pets and animals, especially dogs, and a history of working with charities and nonprofits for various causes.

258.   Plaintiff asserts that Defendant Randy Molina admitted to Plaintiff over the phone in the spring of 2020 during the Covid-19 lockdowns that the Defendant's arrest on the Plaintiff was due to Plaintiff exercising his right to remain silent and to not self-incriminate himself.

259.   Plaintiff affirms that once Plaintiff caught Defendant, Randy Molina, in a vulnerable position admitting guilt and evidence of criminal corruption and criminal abuse, Defendant, Randy Molina falsified a second police report claiming Plaintiff threatened Defendant, Randy Molina, with a gun, thus committing perjury by Defendant, Randy Molina.

260.   Plaintiff affirms Defendant Randy Molina, intentionally put Plaintiff in further harm's way with law enforcement due to Plaintiff having evidence against Defendant's crimes.

261.   Plaintiff suffered further harassment and mistreatment while in the custody of the City of Fort Worth and the City of Mansfield jails, subjected to insults and improper delays in processing his release.

262.   Plaintiff later discovered social media posts by Emily Mathe matching the timeline of events with her dog, Sundae, and an admission that Sundae had been injured and that it was from a fight with another dog, confirming that her dog was injured in a dog fight on the date in question—not injured by Plaintiff.

263.   Plaintiff affirms that this arrest and criminal charge related to this case has been used by local law enforcement employed by Defendants, the City of Fort Worth and Tarrant County, to further smear, defame, and abuse Plaintiff.

264.   Plaintiff has engaged with multiple public officials, including Defendant's, the City of Fort Worth's former Mayor Betsy Price, current mayor Mattie Parker, currenty Chief of Police Neil Noakes, current Assistant City Manager William Johnson, numerous officers in the City of Fort Worth Internal Affairs Division, Anthony Rimshas in Special Investigations Unit, City Council Member Charles Lauersdorf, Defendant, Tarrant County's Felony Court Judge Chris Wolfe, Judge Deborah Nekhoem, Sheriff Bill Waybourn, former County Judge Glen Whitley, former Texas State Representative and current Congressman Craig Goldman, to report Defendant's crimes and misconduct.

265. Plaintiff affirms several of these public officials receive and give endorsements to one another and assist Defendants from being reprimanded, disciplined, investigated, arrested, and / or charged for partaking in criminal activity.

266. Plaintiff affirms that Plaintiff spoke with Tarrant County Judge Chris Wolfe in 2022 about the abuses being committed by law enforcement employed by Defendants, the City of Fort Worth and Tarrant County, and confirmed with Tarrant County Judge Chris Wolfe that law enforcement are influencing the courts in Tarrant County and are influencing elected officials including the Tarrant County District Attorney's office and the Tarrant County Sheriff's Department.

267. Plaintiff asserts that law enforcement officials working for Defendants, the City of Fort Worth and Tarrant County and current and former district attorneys in Tarrant County are engaged in systemic corruption and bribery between law enforcement, judges, and other public officials to allow law enforcement to abuse their authority and sworn oath to office.

268. Plaintiff suffered great embarrassment, financial hardships, emotional distress, and loss to livelihood and reputation from the malicious, negligent, defamatory, and illegal actions of the Defendants.

269. Plaintiff suffered public scrutiny from family, friends, and colleagues, and experienced further harassment from law enforcement officers employed by and associated with Defendants since the false arrest.

270. Plaintiff and his spouse, Jenice Stricker-DeWitt eventually sold their home in Fort Worth, Texas to avoid further harassment and abuse from Defendants.

271. Plaintiff affirms Plaintiff discovered a similar incident occurred in the City of Fort Worth and Tarrant County and was published by journalist / reporter Harriet Ramos with the Fort Worth Star-Telegram except Defendant, the City of Fort Worth's police department were investigating a citizen that admitted to shooting a neighbor's dog out of self-defense.

272. Plaintiff affirms that Defendant, the City of Fort Worth and their police department worked with journalist / reporter, Harriet Ramos, with the Fort Worth Star-Telegram to keep this citizen's name private, unlike with the Plaintiff, in their reporting.

273. Plaintiff affirms there in no known public record that indicates this citizen was arrested by Defendant, the City of Fort Worth's police department and animal cruelty division despite this citizen admitting to harming and killing a neighbor's dog, unlike with the Plaintiff's circumstances.

274. Plaintiff affirms Defendants did not provide him with the same opportunity of privacy because Plaintiff exercised his right to remain silent and not self-incriminate himself to Defendants.

275.    Plaintiff affirms that Defendant Randy Molina, wanted Plaintiff to admit to guilt and acted with malice towards Plaintiff for not giving Defendant, Randy Molina, the opportunity and satisfaction to coerce and / or self-incriminate himself.

276.    Plaintiff affirms Defendants attempted to add lies and remove exculpatory information from the police report associated with Case # 1476643.

277.    Plaintiff affirms Defendants have attempt to justify probable cause based on the false allegations and manipulated police report by Defendant, Randy Molina, in an attempt to achieve probable cause and conviction and acted with malice in doing so.

278.    Plaintiff affirms Defendants violated several civil and criminal laws including perjury, abuse, and corruption against Plaintiff and Plaintiff's rights including violations of 4th Amendment, 5th Amendment, and 14th Amendments.

279.    Plaintiff affirms Plaintiff's business suffered great losses and eventually did not become profitable enough to justify operations.

280.    Plaintiff affirms investor, Andrew Geesbreght, later pulled his six (6) to seven 7 (7) figures offer to Plaintiff.

281.    Plaintiff affirms his career in the lawn care, landscaping, and property maintenance industries suffered drastic loss.

282.    Plaintiff affirms Plaintiff's reputation suffered such great losses that Plaintiff switched industries and career paths after this incident.

283.    Plaintiff affirms Plaintiff was very passionate about his business and the landscape and property maintenance industries with expectations to grow and scale a profitable business that would lead him into other investments and into future wealth.

284.    Plaintiff affirms the Fort Worth Star-Telegram have not taken down their article or written a proper retraction on behalf of Plaintiff after Defendants actions.

285.    Plaintiff affirms Plaintiff's spouse, Jenice Stricker-DeWitt, contacted other media outlets that shared the Fort Worth Star-Telegram's article against Plaintiff and requested they be taken down.

286.    Plaintiff affirms if his name is searched online or in Google or other search engines, the article from the Fort Worth Star-Telegram is the first headline to populate Plaintiff's mugshot, name, and reputation attached to false injuries to the dogs Moxie and Sundae due to Defendants' words and actions.

287.    The Fort Worth Police Department, under current Chief of Police, Neil Noakes, have continued to illegally and criminally target and retaliate against Plaintiff for Plaintiff

exposing a criminal network associated with Defendants including felony corruption, felony abuse, felony bribery, false arrests, perjury, child abuse, elderly abuse, child exploitation, and fraud among other crimes committed by law enforcement officers and other elected and unelected public officials employed by Defendants, the City of Fort Worth and Tarrant County.

288.    Plaintiff affirms Defendant, the City of Fort Worth, is currently being sued by former employee, Paula Conaway, in which Paula Conaway submitted sworn testimony that Defendant's current Chief of Police, Neil Noakes, terminated Paula Conaway from her position as Police Captain after she opened an investigation into a colleague accused of assaulting a citizen.

289.    Plaintiff affirms Paula Conaway's lawsuit claims Defendant's Chief of Police, Neil Noakes, terminated Paula Conaway's employment because Neil Noakes stated their police department was not going to "retaliate" against their police officers.

290.    Plaintiff affirms Defendant, the City of Fort Worth, has allowed Neil Noakes and Defendant's police department to illegally weaponize their police department against its citizens and community.

291.    Plaintiff affirms the evidence shows Defendants acted outside of their purview.

292.    Plaintiff affirms Defendants do not qualify for immunity.

293.    Plaintiff affirms Defendants acted with extreme malice.

294.    Plaintiff affirms Defendants acted with extreme negligence.

295.    Plaintiff affirms Defendants acted with extreme recklessness.

296.    Plaintiff affirms Plaintiff has evidence that Defendants are engaged in criminal activity with judges and other local, state, and federal public officials.

## V. CAUSES OF ACTION

### COUNT 1: VIOLATION OF 42 U.S.C. § 1983 (FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS)

Defendants violated Plaintiff's constitutional rights by falsely arresting him without probable cause and for initiating an arrest for Plaintiff exercising his 5th Amendment right.

### COUNT 2: MALICIOUS PROSECUTION

Defendants initiated false and baseless criminal proceedings against Plaintiff with malicious intent.

## COUNT 3: DEFAMATION

Defendant Molina, in collaboration with the Fort Worth Star-Telegram, spread false allegations, irreparably harming Plaintiff's reputation.

## COUNT 4: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Defendants' actions caused Plaintiff to suffer severe emotional distress, anxiety, and financial hardship.

## COUNT 5: MONELL LIABILITY AGAINST CITY OF FORT WORTH

The City of Fort Worth failed to properly train, supervise, reprimand and discipline its officers, enabling misconduct.

## VI. REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

- Compensatory damages in an amount of no less than $100,000,000.

- Maximum punitive damages against Officer Molina for malicious and reckless misconduct.

- Maximum punitive damages against the City of Fort Worth for improper training, supervision, and discipline to Officer Randy Molina.

- A full audit and criminal investigation of law enforcement agencies in Tarrant County from state and federal authorities.

- Attorneys' fees and court costs under 42 U.S.C. § 1988.

- Such other relief as this Court deems just and proper.

## VII. JURY DEMAND

Plaintiff demands a trial by jury on all issues triable by a jury.

Respectfully submitted,

WILLIAM MICHAEL DEWITT
Pro Se Plaintiff
2375 W Wilk Highway
Hawks, MI 49743
(870)919-1585
michael85dewitt@gmail.com